654 F.2d 1280
 Dwight MANNEY, by his mother, Annie Mae Manney, as next
friend, on behalf of himself and all others
similarly situated, Plaintiffs-Appellees,
v.
Clarence E. CABELL, in his capacity as Los Angeles County
Acting Chief Probation Officer; John Sarchett, in his
capacity as Superintendent of Los Angeles County Central
Juvenile Hall; Sidney Dwoskin, in his capacity as Chief of
Health Services for the Los Angeles County Probation
Department; Eugene Weiner, in his capacity as Chief
Physician of Los Angeles County Central Juvenile Hall;
Baxter Ward, James Hayes, and Edmund E. Edelman, in their
capacities as Supervisors of the County of Los Angeles,
Peter F. Schabarum, Kenneth Hahn, Defendants-Appellants.
 No. 79-3260.
 United States Court of Appeals,
Ninth Circuit.
 April 29, 1980.
Rehearing and Rehearing En Banc Denied Aug. 27, 1981.
 
 Erich P. Wise, Western Center on Law & Poverty, Los Angeles, Cal., for plaintiffs-appellees.
 Philip H. Hickok, Frederick R. Bennett, Deputy County Counsels, Los Angeles, Cal., argued for defendants-appellants; John H. Larson, County Counsel, Los Angeles, Cal., on brief.
 Appeal from the United States District Court for the Central District of California.
 Before KENNEDY and HUG, Circuit Judges, and SMITH*, District Judge.
 HUG, Circuit Judge:
 
 
 1
 This is a class action, brought under 42 U.S.C. § 1983, challenging almost every condition of confinement at Central Juvenile Hall (CJH) in Los Angeles. The complaint alleged violations of several federal and state constitutional provisions, as well as state statutory provisions.
 
 
 2
 The defendants in the action are the Acting Chief Probation Officer of Los Angeles County, the Superintendent of CJH and various other county and CJH officials (collectively, the "County"). The district court, pursuant to Fed.R.Civ.P. 23(b)(2), certified the class as all males incarcerated at CJH "who are alleged to be or have been found to be persons described by California Welfare and Institutions Code § 602."[1]
 
 
 3
 The district court issued a preliminary injunction on May 10, 1976, which was modified on December 29, 1976, with respect to overcrowding at CJH. Trial was held before the district judge sitting without a jury during September and October, 1976. Progress reports were submitted to the district court subsequent to the trial, and several conferences were held in an attempt to settle the matter, but the parties could not reach any agreement.
 
 
 4
 On April 12, 1979, the district court issued the order and judgment which is the subject of this appeal. With respect to the majority of the claims, the court found no constitutional or statutory violations. No appeal was taken from this portion of the order, and thus, those issues are not before us in this appeal. The district court did find that overcrowded conditions, certain hygienic practices, and the system of medical care at CJH violated the provisions of the United States and California Constitutions that proscribe cruel and unusual punishment (U.S.Const., amend VIII; Cal.Const., art. I, § 17) and also violated section 502 of the California Welfare and Institutions Code.[2]
 
 
 5
 More specifically, the district court ordered that the County could not permit the number of juveniles housed at CJH to exceed the maximum rated capacity for CJH as established by the California Youth Authority (CYA), that beds in the infirmary and segregation units could not be counted in determining that capacity, and that no juvenile could be required to sleep on the floor except for prescribed medical reasons. In addition, the district court ordered that the County allow each juvenile to take one shower a day of at least five minutes duration and that each shower stall be equipped with a device to maintain privacy and with individual controls to regulate the flow and temperature of the water. The order further specified that the County was not to permit any juvenile to be assigned to a room without a toilet unless a procedure was established that would allow the juveniles, when required to be in their rooms, to gain access to a toilet without asking permission. The district court also ordered comprehensive changes in the medical care system at CJH.[3] The County appeals from the relief granted, contending that there are no constitutional or statutory violations in the conditions of confinement at CJH.
 
 
 6
 * CJH is a temporary detention facility, housing juveniles at various stages in their progression through the California juvenile justice system. A juvenile accused of a criminal act may be temporarily detained for up to 72 judicial hours prior to a formal detention hearing, which is analogous to the preliminary hearing phase of the adult criminal justice system. At the detention hearing the juvenile court may order the release of the juvenile or it may order further detention of the juvenile, pending an adjudication hearing. See Welf. & Inst.Code § 636. After the adjudication hearing, which is similar to an adult trial, see Welf. & Inst.Code §§ 650-780, the case may be continued for up to two weeks for a disposition hearing, which is similar to an adult sentencing. At the disposition hearing the court formulates and orders an appropriate plan of treatment for the juvenile.
 
 
 7
 Almost 30% of the juveniles at CJH are awaiting their adjudication hearing, and a like number are awaiting their disposition hearing. A small number of juveniles are detained at CJH after their disposition hearing, while awaiting the availability of a bed at the appropriate treatment facility. When this suit was filed the total number of section 602 juveniles at CJH numbered approximately 340. CJH also housed about 190 other juveniles who are not subject to section 602, and thus are not included in the plaintiff class.
 
 
 8
 The average length of stay of juveniles of the plaintiff class at CJH is approximately two weeks. Between 90-95% of the section 602 juveniles leave CJH within two months.
 
 II
 
 9
 We are faced initially with the question of whether the district court should have abstained from exercising its jurisdiction. Although there are several different theories of abstention, see C. Wright, Handbook of the Law of Federal Courts § 52, at 218 (3rd ed. 1976), the theory with which we are concerned in the present case has its foundation in the Supreme Court's decision in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).
 
 
 10
 To determine the appropriateness of Pullman abstention, this court has set forth the following guidelines for consideration in each case:
 
 
 11
 (1) The complaint "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open."
 
 
 12
 (2) "Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy."
 
 
 13
 (3) The possibly determinative issue of state law is doubtful.
 
 
 14
 Canton v. Spokane School District No. 81, 498 F.2d 840, 845 (9th Cir. 1974) (footnote omitted); cited with approval in Sederquist v. Tiburon, 590 F.2d 278, 281 (9th Cir. 1978); Isthmus Landowners Association v. California, 601 F.2d 1087, 1091 (9th Cir. 1979). Ordinarily, all three exceptional circumstances must be present to justify abstention.
 
 
 15
 The appellants in this action made a motion requesting the district court to abstain. They relied principally on the fact that the California courts have not construed Welf. & Inst.Code §§ 202 and 851 with respect to actual conditions of confinement at juvenile detention centers.[4] The specific language of the two sections that raises the construction problem is: "(T)o secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents," in section 202; and, "It shall be conducted in all respects as nearly like a home as possible," in section 851.
 
 
 16
 Section 202 and its predecessor, section 502, have been construed by the California courts in the context of whether a juvenile should be taken from the home and committed to CYA care. See People v. Olivas, 17 Cal.3d 236, 131 Cal.Rptr. 55, 551 P.2d 375 (1976); In re Aline D., 14 Cal.3d 557, 121 Cal.Rptr. 816, 536 P.2d 65 (1975); In re Wayne J., 97 Cal.App.3d 776 (1979); In re Todd W., 96 Cal.App.3d 408, 157 Cal.Rptr. 802 (1979); In re Carrie W., 89 Cal.App.3d 642, 152 Cal.Rptr. 690 (1979). Neither section 202 nor section 851 has been interpreted with respect to the conditions of such confinement. The California Supreme Court has stated that the juvenile court law is to be liberally construed to carry out the purposes of section 502 (now section 202), and that juvenile proceedings are designed for rehabilitation and treatment, not punishment. See People v. Olivas, 17 Cal.3d at 255, 131 Cal.Rptr. 55, 551 P.2d 375; In re Aline D. The plaintiffs in this action asserted sections 202 and 851 as bases for relief along with their state and federal constitutional claims.
 
 
 17
 Having set forth the state law issues presented by the plaintiffs, we must apply the criteria for determining the propriety of Pullman abstention. Application of the abstention doctrine involves a "discretionary exercise of a court's equity power," the propriety of which is to be determined on a case-by-case basis. Baggett v. Bullitt, 377 U.S. 360, 375 & n.11, 84 S.Ct. 1316, 1324, n. 11, 12 L.Ed.2d 377 (1964). We bear in mind that the federal courts are particularly hesitant to abstain in section 1983 cases. See Canton v. Spokane School District No. 1, 498 F.2d at 845-46; see also Field, Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine, 122 U.Pa.L.Rev. 1071, 1131-34 (1974).
 
 
 18
 There is no question that a state's operation of its detention facilities involves a sensitive area of social policy, an area into which the federal courts do not lightly intercede. See Spain v. Procunier, 600 F.2d 189, 193-94 (9th Cir. 1979); Pell v. Procunier, 417 U.S. 817, 825-26, 94 S.Ct. 2800, 2805, 41 L.Ed.2d 495 (1974). The operation of juvenile halls such as CJH clearly satisfies the first Pullman criterion.
 
 
 19
 The second Pullman guideline is also applicable to this case. The wording of sections 202 and 851 appears to evidence an intention that conditions at juvenile halls meet high standards. The standard expressed in those sections could plainly be interpreted to require that conditions at juvenile halls be more favorable to the juvenile than the minimum standards guaranteed by the federal constitution.[5]
 
 
 20
 A review by the California courts of the conditions of confinement at CJH under the statutory standards could well obviate the need for a constitutional adjudication of the conditions of confinement. The "nub of the whole controversy" may be the Welf. & Inst.Code sections. See Reetz v. Bozanich, 397 U.S. 82, 87, 90 S.Ct. 788, 790, 25 L.Ed.2d 68 (1970). "A state court decision . . . could conceivably avoid any decision under the Fourteenth Amendment and would avoid any possible irritant in the federal-state relationship." Id. at 86-87, 90 S.Ct. at 790.
 
 
 21
 Having concluded that the first two Pullman standards have been fulfilled we must determine whether the possibly determinative issue of state law is doubtful. The California courts have not construed the relevant statutes with respect to conditions of detention. While the language of the statutes seemingly requires a very high standard of care, the California Supreme Court has recognized that budgetary limitations may preclude maintenance of facilities necessary to provide the minor with optimum care and treatment. See In re Aline D., 14 Cal.3d at 567, 121 Cal.Rptr. 816, 536 P.2d 65. Especially in light of the recent statutory amendments, see note 2 supra, the interpretation of the potentially determinative statutory language is doubtful.
 
 
 22
 Because we find the existence of all three Pullman factors in the present case, we conclude that this is a proper case for application of this abstention doctrine. Our decision to abstain is further supported by the fact that the operation of California's juvenile halls is part of a comprehensive statutory scheme regulating the juvenile justice system in California. See Welf. & Inst.Code §§ 200-2006.[6]
 
 III
 
 23
 Because we find the district court should have abstained from exercising its jurisdiction, we vacate the judgment of the district court and remand the case to the district court.[7] The district court should retain jurisdiction of the federal constitutional issues at the request of either party, pending proceedings in the state courts. See England v. Louisiana Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); American Trial Lawyers Association v. New Jersey Supreme Court, 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973).
 
 
 24
 We are not unmindful that the decision in this case places an added burden on the plaintiffs. The sensitivity and importance of the issues involved, however, outweigh such considerations. It is also important that current conditions at CJH, which have changed significantly since the trial in 1976, be evaluated under the standards required by the California statutes.
 
 
 25
 VACATED and REMANDED.
 
 
 
 *
 The Honorable Russell E. Smith, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 California Welfare and Institutions Code § 602 provides:
 Any person who is under the age of 18 years when he violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court.
 
 
 [2]
 Section 502 has been repealed and replaced by § 202 of the California Welfare and Institutions Code which provides:
 (a) The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the state; to protect the public from criminal conduct by minors; to impose on the minor a sense of responsibility for his own acts; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when necessary for his welfare or for the safety and protection of the public; and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes.
 (b) The purpose of this chapter also includes the protection of the public from the consequences of criminal activity, and to such purpose probation officers, peace officers, and juvenile courts shall take into account such protection of the public in their determinations under this chapter.
 Section 202 is essentially the same as section 502, the major change being the addition of phrases emphasizing that one of the objectives of the act is to protect the public from criminal conduct of minors and to impose upon the minor a sense of responsibility for his own acts. One California court has stated that this amendment sets forth "(a) long overdue objective of juvenile justice." In re Gregory S., 85 Cal.App.3d 206, 213, 149 Cal.Rptr. 216, 220 (1978).
 Section 202 was enacted in 1976, when California revised and amended the entire statutory framework of its juvenile justice system. See Cal.Welf. & Inst.Code §§ 200-2006 (West Supp.1980). Unless otherwise noted, all references in this opinion are to the new code sections.
 
 
 [3]
 The district court had also ordered relief with respect to establishment of an individualized treatment plan for the juveniles; however, this section of the order was vacated by the district court on May 18, 1979, and thus is not the subject of any claim on this appeal
 
 
 [4]
 Welf. & Inst.Code § 851 provides:
 The juvenile hall shall not be in or connected with, any jail or prison, and shall not be deemed to be nor be treated as a penal institution. It shall be conducted in all respects as nearly like a home as possible.
 
 
 [5]
 In Bell v. Wolfish, 441 U.S. 520, 535 & n.16, 99 S.Ct. 1861, 1872 & n.16, 60 L.Ed.2d 447 (1979), the Supreme Court held that, with respect to conditions of confinement, pretrial detainees are entitled to the protections of the Due Process Clause, which are greater than the protections afforded by the cruel and unusual punishment proscription of the Eighth Amendment
 There are approximately equal numbers of pre-adjudicatory and post-adjudicatory juvenile detainees at CJH. The California Supreme Court has declared that the cruel and unusual punishment provisions of the United States and California Constitutions do not apply to juvenile commitments, because the purpose of such a commitment is rehabilitation, not punishment. See People v. Olivas, 17 Cal.3d 236, 255, 131 Cal.Rptr. 55, 551 P.2d 375 (1976); In re Gary W., 5 Cal.3d 296, 301-03, 96 Cal.Rptr. 1, 486 P.2d 1201 (1971). The correct standard of review in this case is therefore under the Due Process Clause.
 There is also some authority that there is a constitutional right to rehabilitative treatment for the juveniles. See Nelson v. Heyne, 491 F.2d 352, 360 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3188, 41 L.Ed.2d 1146 (1974) (holding that such a right exists). Contra, Morales v. Turman, 562 F.2d 993, 998 (5th Cir. 1977) (doubting the existence of such a right).
 
 
 [6]
 Annual inspection by juvenile court judges of juvenile halls is required by Welf. & Inst.Code § 209. Although this inspection is obviously not akin to a judicial proceeding, it is a further indication of the state regulatory interests involved
 
 
 [7]
 In a petition for rehearing, the plaintiffs raise the concern that our holding on Pullman abstention implies an incorrect conclusion on the question of whether there is an exhaustion of remedies requirement applicable to suits brought under section 1983. We do not hold that, as a general matter, plaintiffs bringing suit under section 1983 must always exhaust the possible bases of relief provided by state law. Instead, we rely upon the Supreme Court's application of the Pullman abstention doctrine in Boehning v. Indiana State Employees Association, Inc., 423 U.S. 6, 96 S.Ct. 168, 46 L.Ed.2d 148 (1975) (per curiam). That decision illustrates that abstention may be proper, not only when a state statute is itself attacked, but also when a state action is attacked on constitutional grounds
 The plaintiffs expressly base their challenge to state action on two grounds: constitutional violations and state law violations. Where the plaintiff identifies state law as a source of his remedy, and where the state statute provides a significant opportunity for relief which has not yet been defined by the state courts, abstention is appropriate. We do not reach the more difficult question of application of the Pullman doctrine to a challenge to state action where the plaintiff has not sought relief under state statutes.